Good morning. Welcome to the Ninth Circuit. We have a full courtroom today. It's very nice to see all these students here. Welcome. So I'm Judge Michelle Friedland. I'm with my colleague from Hawaii, Judge Mark Bennett, and we're very happy to welcome Judge Richard Bennett. I'm the only not Bennett on the panel today, and he is sitting by designation from the District of Maryland. Thank you, Judge Friedland. It's always an honor to sit with the Ninth Circuit by designation, and I'm pleased to be here. We're thrilled to be sitting with you, and really thank you for your help. So we have, I think, some cases that are submitted on the briefs today. So Sostillo v. Swift is submitted on the briefs. That is 22-55560. Otherwise, we will hear the cases in the order in which they appear on the calendar. So after we're done with our cases, we will go back in conference, and then we're coming back out to talk to the students. So anyone is welcome to stay and hear us talk to the students if you'd like. We will not talk about any of these cases or any pending cases. So no obligation to stay, but it's a public event if anyone wants to stay. So with that, let's start with Hampton v. State of California 22-15481, but we're hearing it together with Harris v. Allison 22-15921, and Cooper and Legg v. Allison 22-16088. The times in this case are very complicated, but the state will begin with 15 minutes, and then we'll go as on the day sheet, list the times. Please, the Court. Good morning, Your Honors. Supervising Deputy Attorney General Jeffrey Fisher on behalf of the defendants in all of the consolidated appeals. This case arises from a series of decisions made in response to a crisis at one of California's prisons during a time of national emergency and global uncertainty at the beginning of the COVID-19 pandemic, and under the oversight of the federal court and a federally appointed receiver. The result was a tragic COVID outbreak that caused hundreds, if not thousands, of infections and claimed a number of lives. But that outcome, as regrettable and unfortunate as it might be, cannot form the basis of liability in these cases. I don't mean to interrupt you for a question, Judge Friedland. I'm going to ask if there's any way you could move the Thank you so much for pointing that out. The district court in this case should have dismissed these actions on the grounds that the Public Readiness and Emergency Preparedness Act bars all of the causes of action. It should have dismissed the civil rights claims under Section 1983 under the doctrine of qualified immunity, and should have dismissed in the Hampton matter the state law causes of action under certain state law immunities under the California Government Code. I'd like to begin with the first of those issues, the PREP Act, the Public Readiness and Emergency Preparedness Act. It would resolve all of the cases before the court if found in defendant's favor, and because it was the subject of the court's focus order. I'd like to start with that focus order, with just a sentence or two of background. Now, the PREP Act is a statute passed in 2005 to address another communicable disease scare that was occurring at that time. The intent of it was to create a large immunity that is normally dormant, but is activated when the Health and Human Services Secretary issues a declaration that identifies what they call covered countermeasures the Health and Human Services Secretary would like the public to implement to help it respond to whatever that emergency is. So, counsel, swabbing COVID tests are a covered countermeasure? Yes. Let me ask you a question. If you give someone, give an inmate, a swab on January 1st, 2021, does that mean that your failure to re-swab the inmate forever is insulated under the PREP Act? That if you decide never to swab the inmate again, you're immune no matter what harm that causes? If it's alleged that that is the cause of the harm, under the plain language of the statute, arguably yes. The court doesn't need to construe it that broadly in this case, because those aren't our facts. It seems to me that in the light most favorable to the plaintiffs, those are our facts. Obviously, it's not like 30 years, but it seems to me that it would be a big stretch to read the claim for loss as a causal relationship with the administration to or use by an individual of a covered countermeasure to say, one and done. You do it once, and you are immune from liability forever. If it's not forever, how do you draw the line as to when it is? Next day, okay. If it's not forever, how do you draw the line? I'd like to respond to that in two ways, Your Honor. First, the allegations in the complaint aren't that there was only one test administered. There was a general response that CDCR had to the email, for example, need to re-swap, no re-swapping. In the light most favorable to the plaintiff, that's a pretty serious allegation. But again, going to my question, where do you draw the line? The line that Congress drew was on causation. If the claim of loss is causally related to a decision about the administration of countermeasures, it's covered under the PREP Act. Are you saying if they had never tested, it would still be covered by the PREP Act? If they had never tested, you wouldn't be able to determine it on the pleadings, because a complete absence of use of countermeasures, even under the HHS Secretary's interpretation of the PREP Act, wouldn't be covered. It would have to be an intelligent decision based on administrative factors, something specific that made them decide not to use the test in that instance. Isn't part of the coverage of the Act that there has to have been administration of the countermeasure? Certainly, Your Honor. In this case, there were the tests administered in early and mid-May. There was a decision near the end of May to conduct the transfer. Rather than testing again prior to transfer, they screened the inmates for COVID symptoms before having them board the transport buses, screened them again when they were arriving and tested again. Are you saying you do need some administration of the test to even be in the PREP Act ballgame? It would be difficult to assess a failure to test at all on the pleadings as included within the PREP Act. If in discovery it was determined there were insufficient tests overall and there was a decision made to not test because of that, or there was a complete absence of tests, it might not be included. But in this case, we have testing both prior to the transfer and immediately after the transfer. Why doesn't the fact that you had testing immediately after the transfer hurt you, because it shows that the tests were available and could have been done before the transfer? Because that's an administrative decision to determine to rely on screening, which was what the CDC had recommended prior to the transfer, and to conduct the test after the transfer was conducted. But then why isn't this a claim of non-administration, which would take you out of the PREP Act? That would be an inappropriately narrow view or construction of the statute, which was intended to grant broad immunity to decisions about how and when. Let me give you a hypothetical. Let's say hypothetically the factual allegations were the reason there wasn't a retest was because the defendants knew the results of the retest would be positive. And if the results of the retest were positive, then they couldn't move the inmates to Quentin. And they wanted to move the inmates to Quentin no matter what, and they didn't care that they were moving people with COVID. And that's the reason they didn't retest. I mean, that's a factual hypothetical. Is your argument still the allegation at the pleading stage? No, but for a different reason, Your Honor. That is still an administrative decision, but there is an exception to the immunity under the PREP Act for acts of willful misconduct that result in death or serious injury. And in that case, there is a cause of action. It just is a cause of action that would have to be brought in the district court for the District of Columbia and not in the District of California, the Northern District of California. So the Congress created an exception for that type of alleged conduct. And so at that point, it would fall out of the immunity provision, though it would still be within the overall scope of the PREP Act because it's still a decision about the administration of countermeasures, which is what we have here. There were countermeasures administered prior to the, you know, in the early months, in the early part of May and mid-May, there was a decision to conduct the transfer. And rather than retest at that time, the decision was made to screen at that time, screen again when they arrived at San Quentin, and then test at that time. Once they had been at that time, the concern at that time was to protect... Is it a fair reading of the complaint that prior to the transfer, there had already been a decision to retest when they got to San Quentin? Is it? I do believe that's a fair reading of the complaint, Your Honor. Yes. I mean, I thought the reason they tested when they got to San Quentin was because by then, people who had been on these buses were showing COVID symptoms, and now it's spreading, and now they're testing, and not that that had been the plan from the start. In either event, it would still be a decision about the administration of covered countermeasures. It was the decision to rely on screening... But basically, at the time they didn't test before the buses, there had been tests a month before and no more tests. So what if the... So it feels to me like we're in a situation of non-administration rather than administration at that point. But just to press this, I'd like to give a hypothetical. So say the test that had happened at CIM happened before anyone had COVID at all at CIM. So they tested CIM, everyone's negative, there's no problem, there's no COVID. Now COVID starts in CIM, and they put everyone on the buses. Is that still an administration that you think is covered by the PREP Act? If the allegation in the complaint, the theory behind the complaint is that the complete failure to test was the cause, then perhaps it would fall into that category. But the period of time that we're dealing with is beginning in mid to May to the end of May. And a decision was made at that time to use a different form of attempting to determine who had COVID, to screen for symptoms instead of conducting another test so that they could rapidly move those inmates out of the dangerous environment they were in at CIM and move them to where they believed they would be safe. But so then it's like what they decided to do is screen, which is not a countermeasure. I mean, that's not covered by the PREP Act, just we decide to screen instead of doing testing. Now we're not under the PREP Act, right? It arguably is still covered under the PREP Act. That hadn't been explored by the parties very in much depth, but it uses a diagnostic device, which is a thermometer to determine whether the inmate has a symptom. And that is used in attempting to diagnose COVID-19. Would the same thing be true about, let's say, an LPN is looking at the people and said, doesn't look to me like they have COVID? No, it wouldn't constitute a diagnostic device, I don't believe. I think that the questionnaires on their own don't seem to fit the definition of under the PREP Act, but they would, the use of the thermometers would arguably also constitute an additional covered countermeasure. Did the secretary designate thermometers? I thought, don't you have to say something about what the countermeasures are or no? In this case, the definition of covered countermeasures was broadly worded to include diagnostic devices that were used to diagnose and or treat COVID-19 to identify who has it. I believe that thermometers would be included under the secretary's definition and the statutory definition, your honor. Has anyone ever said that before? In the briefing below, I believe it was brought up. I cannot give you a pin site to it, your honor. But no court has ever said that thermometers were COVID countermeasures. There's very little legal authority on the PREP Act, so I would venture to say probably not, your honor. With four minutes remaining, would you like me to move on to the next issue or directly? I think the next issue would be good because we're going to run out of time. So I would like to focus on the second prong of the qualified immunity analysis, which I believe bars the section 1983 claims that issue in this case. The legal standard for that second prong is intended to make it so that there are essentially lines on the road for the government when they act and know whether they are in the lane that is constitutional or the lane that is not. And that's why most recently, as recently as 2021, the Supreme Court has essentially said that the standard is an except in the rare, obvious case, there needs to be some prior precedent either from the Supreme Court or this court finding a constitutional violation under similar circumstances. And that type of case just doesn't exist in this case. Counsel, could you move somebody with typhoid into the general population? Would you have would you have immunity for for doing that? Because it's not clearly established that you can't move somebody with typhoid into the general population. I don't believe so. Probably for the case. I haven't done the research on that. That with if it's a person who is known to have it and placed in the general population where they could directly interact with people who don't have it, it's possible that that would fall into the the category of obviousness cases given the seriousness of typhoid. And in the light most favorable to the plaintiffs, isn't isn't that what they're essentially alleging? Uh, no, you're right. And the what they're alleging is that in the context of an emergency situation where there was pressure on them from the plot of plaintiffs in ongoing class action to get the inmates who were test who had previously tested negative for covid out of C.I.M. to move them to a place where they would be safer. And the decision was made to rely on screening. But they're also talking about what happened at Quentin, right? Not not just what happened in moving, but what happened after they arrived, right? Happened after they arrived. Your honor was that they were the two people who exhibited covid like symptoms were immediately isolated in the adjustment center, which is the most isolated that a person can be in San Quentin. And the remaining inmates from the transfer were put on the top two tiers of the housing unit suit to minimize the possibility that they might interact with people. And then the complaints alleged that they ate in the dining room, took showers with everyone. Well, again, there's no precedent that would establish that that level of overlap in these it was simply concerned that they might be exposed to a to a disease would constitute a violation of the Eighth Amendment. The cases that we have to rely on are Helling versus McKinney, who Toby Finney, Andrews V. Cervantes and Parsons case Parsons v. Ryan. For those latter two from this court, the Helling case is substantially factually distinct. It is about secondhand smoke and putting a person in the same cell as someone who smokes five packs of cigarettes a day. And the actual issue that the court was focused on was whether that already contracted some sort of particular ailment based on their exposure to that secondhand smoke. There's no allegation of double selling in this case, even if that case were to determine to establish that double selling an inmate with someone who smokes and by analogy, someone who has COVID-19 violates the Eighth Amendment. That wouldn't that wouldn't establish that the response to the COVID pandemic described in the complaint and the OIG report would violate the Eighth Amendment. Who Toby Finney is less analogous. The that dealt with conditions in punitive isolation cells where it was a number of conditions and the extent of confinement there that constituted an Eighth Amendment violation. The only portion of the sentence that relates to communicable disease is that one of the practices was that they would use mattresses on the floor to sleep and then those mattresses would be stored somewhere during the sounds like you're making. But given the typhoid response, it seems and the way you're describing these cases, it sounds like your difference here is that they didn't know for sure that some of these people had COVID. That is among the many circumstances that would make this case unique, Your Honor. Yes, that at that time there was a concern that those people had been exposed, but no establishment that they but isn't it basically if you take the allegations in the favorable to the plaintiffs that it was impossible that none of the people on these vans had COVID at that point. I mean, they hadn't been tested. They hadn't been properly screened. They had symptoms. They've been on the bus together and now they're in an open air cell and now they're eating and showering with everyone. There's just no way that they didn't have COVID. Some of them and they're all together. May I complete my answer? I understand this is only the first 50. Yes. Yes. And you'll have some more time later too. The answer is we don't believe that it's appropriate to find that this would be an obvious case in light of the numerous circumstances that CDCR was facing at the time that these actions were taken that this was the first few months of a pandemic of a disease that was brand new and hadn't and public health authority hadn't settled on even the details of how it was transmitted between people. The general guidance was you should try to keep people as separated as possible, but it was being discovered that it was almost impossible to determine. So I mean, it seems like eventually when when we get past the pleading stage, you may be able to show that your clients didn't understand how COVID was transferred, were confused by the guidance, you know, had a lot of reasons to not understand what should happen. But taking the allegations of the complaint, it seems like those are fact disputes. The allegations of the complaint are they'd been warned, they knew, and it was obvious these people had COVID. And so at that point, I don't understand how we can use the things you might show later to the complaint doesn't state a claim. Our position would be that the immunities that we're discussing here, the PREP Act and qualified immunity are intended to be immunities from suit. And when the complaint and the documents attached to it and content that is subject to judicial notice makes it sufficiently clear that this is a unique set of circumstances that it's appropriate to apply qualified immunity at the pleading stage. What we can see from that is that in the transfer case, many steps were taken to try to protect the inmates at CIM by yet removing them from an institution where there was an outbreak. And additional steps were made to try to protect the inmates at San Quentin from the, at that time, hypothetical risk that someone with COVID would be transferred from that institution. They relied on existing test results, current symptom screenings. They did not fill the buses even to their maximum capacity. They were only at 65%. They screened them again when they arrived. They isolated the only two that had any symptoms. They put the remaining two on their own tiers of a housing unit and efforts were made to try to keep them separated. The... Can I ask one question just in response to that, your response, is where is there in the record that the federal receiver actually ordered this movement? Because you placed in your papers the matter of the federal receiver ordering the removal and the movement. In fact, at some point in time later, the federal receiver disapproved of the way it was being handled, did it not? The answer to this latter portion of the question is no. The portion that you're referring to is a time in which the receiver gave Senate testimony before the California Senate and he did acknowledge that what had been done in retrospect was not enough. But he also went on to explain that the reason that the transfer was conducted was in part because he had created a transfer matrix that established when inmates could or could not be transferred. At that time, all the matrix required was that there be a prior negative COVID test. It didn't have a particular time limit on it. He also explained his involvement in the COVID response from the very beginning and in the decision to conduct the transfer. But he didn't say don't wear masks or don't isolate them when they arrived. I mean, you're trying to use the receiver to say all of this position. The relevance of the receiver harkens back to this court's decision in Hines v. Yusuf. And in the Hines decision, it wasn't dealing with COVID. It was dealing with a disease that was more well understood, Valley Fever. And the claims were brought by plaintiffs who were housed in an area endemic for Valley Fever. And this court noted that the general involvement of the receiver in the housing decisions at issue there would weigh in favor of qualified immunity because the underlying query is whether reasonable officials could believe that under the totality of the circumstances, their conduct was constitutional. And the presence and supervision of the receiver would tend to reinforce that given that the receiver's purpose is to help ensure Eighth Amendment compliance. In this case, the receiver's involvement might not have been directly ordering. We won't know that yet, but he was constantly involved, which is clear from all of the documents on the plot of record, including the regular case management conference statements, the regular case management conferences in which he was involved, as well as the statements in the Hampton Addendum at 108-109, 122, 123, 129, where you are seeing communications about what the receiver is directing people to do and what the receiver's office is directing. And so he was involved. We have at no time said that he directly ordered that the transfer occur. If I may, I would like to reserve my last five minutes for rebuttal. Thank you, counsel. Let's hear from the plaintiffs. Good morning. Michael Haddad for the plaintiffs in the Hampton and Ruiz and Warner cases. I'd like to start with the PREP Act to basically hopefully get that out of the way because I don't really think it's a significant defense in this kind of case. The defendants acknowledge the PREP Act has never been applied to a correctional facility anywhere in the country. No court has ever held it to apply. And their one and done basic argument is not even factually accurate. Judge Friedland, as you asked, what evidence is there that there was some deliberation before that the defendants decided to test them in San Quentin? There is no evidence of that. It's not plugged in the complaints. And in fact, in the OIG report at Hampton ADD page 138, the OIG wrote, quote, upon learning of the potentially symptomatic persons on the buses, San Quentin health care staff promptly ordered COVID-19 testing for all the arriving incarcerated persons. We don't even know who that health care staff was. It could have been low level nurses. The point is, there's been no discovery yet. But the pleadings do not support the defendant's argument that the defendants made a strategic decision to test later rather than before. So you agree that swabbing is a covered countermeasure? Yes. Okay. So would your argument be any different if under the PREP Act, if somebody was swabbed on day one, there's an allegation that by day two, the person, if swabbed again, would have tested positive. And the defendants say, well, the science, we decided since he was swabbed on day one, there's limited kits. So we weren't going to swab him again until day four. Would you agree that in that kind of a circumstance, there arguably would be a PREP Act immunity? No, it's still a non-use, Your Honor. If the allegation is that they failed to use it, it's a non-use and it's not covered. Even if it's the next hour? Excuse me? Even if the allegation is you should have tested him an hour later? Well, that becomes a completely different case. And I was about to say that even a four-day differential is so different than the facts that we're dealing with here. Of course, as a proximate cause matter, it would be difficult to make that argument. But that's not the facts as play here. We're talking a three to four-week differential. And when everybody knew by that point, this was not the very beginning of the pandemic. This was May. The California lockdown happened in March. There was all kinds of closure orders. There was all kinds of public health advice about quarantine that regular people knew about. And these defendants, as pled, must have known about. The court asked us to address Section 7 of the Secretary's Declaration of the PREP Act. I just want to really briefly touch on that. What that section means, as I understand it, is that section limits immunity to actual use of a covered measure in response to a declaration, which is defined, and the definition of the declaration requires ordering such use. So I think it makes it even more clear, beyond the cases we already have, that immunity is limited to the actual use of a covered countermeasure. And there's no dispute that sometimes the defendants did use covered countermeasures. So sorry, just to pause you on the argument order and the focus order. But are you saying that you're not relying on the aspect of whether the use or non-use was in accordance with public health and medical response advice? You're not really making an argument that the way they did this was contrary to local public health advice or anything like that. It doesn't sound like. Well, we are arguing that fundamentally, the only mention of covered countermeasures in any of the complaints is that they were not used. Right. So I think your argument is this is non-use, so it's not under the PREP Act. You're not like way in the weeds of this part of the PREP Act that has to do with whether what is done is in compliance with public health advice. You're not really relying on that. That's correct. And there are many, many actions that were pled that are not even covered countermeasures. For example, the failure to quarantine once they arrived at San Quentin, as you pointed out. And the disregarding of the handpicked team of experts' urgent advice. Completely disregarded. The saying no thanks to reputable labs offering tests when they had a lack of tests in June. So all of these things are not covered countermeasures. If the court is ready, I'll be happy to move on to qualified immunity. Okay, great. So the defendants attempt to define the right at issue far too narrowly, demanding that only a prior case involving a prison pandemic and a transfer would have given them notice. But for purposes of qualified immunity, the Seventh Circuit points out the legal duty need not be litigated and then established disease by disease or injury by injury. And that's the Estate of Clark v. Walker case. The Ninth Circuit has made a similar pronouncement in Russell v. Lumetap. It said, quote, it is not necessary to have a case involving a heart attack, a case involving appendicitis, or a case involving a bowel obstruction for a 1983 claim based on one of those conditions to survive qualified immunity. Counsel, the Supreme Court has taken our court to task in qualified immunity cases by saying that we rely all too often on cases that establish something at a high level of generality. Um, so, uh, in a case where we're looking at diseases, um, how would you, uh, sort of parse it so that we're not looking at it in what the Supreme Court has described as a high level of generality? What would you say here where we're talking about COVID is the limiting is the officials on notice of a constitutional violation? Because obviously we have never had COVID-19 until this very, very sad pandemic. Exactly. That question really gets to the heart of the matter. And I have kind of a long answer for that because I've been prepared for that. Oh, it's a long question. So first of all, in Estelle v. Gamble, which really established the duty of prison officials to provide for the medical needs of inmates and prisoners, Estelle even wrote that that is a very broadly construed right. And they said, quote, regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under 1983. So from the beginning, the court formulated that this right is going to be broadly looked at. Secondly, after Estelle, we had Hutto v. Finney, Helling v. McKinney, and Farmer v. Brennan, all Supreme Court cases, that each gave the quintessential example of an Eighth Amendment claim being where officials may not be deliberately indifferent to inmates' heightened risk of exposure to a serious communicable disease. Now, none of those cases dealt with a serious communicable disease except Hutto, but they all thought that this is a simple, easy example we can give in any situation of the most fundamental core Eighth Amendment factual scenario that would apply. Farmer went on to explain, an Eighth Amendment claim need not show that a prison official acted or failed to act believing that harm actually would befall an inmate. It's enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. And here, the complaints clearly plead, by the time this happened, the defendants actually knew about the grave risks from COVID-19. The Plata case we cited in our brief, there, CDCR had acknowledged to the District Court overseeing the medical reform case that, yes, it was an obvious risk. We knew about it, CDCR said. And in the Don Stage case, CDCR, again, and Warden Broomfield, again, stipulated that they were personally aware of the high risk from COVID-19. And in fact, the defendants created a greatly enhanced risk here that would not have existed but for their conduct. And then, they knew about all that, of course, and then they failed to take reasonable measures to abate the risk. The reasonableness of their measures is ultimately going to be a question of fact. And that's what the defendants want to argue outside of the pleadings. But what they did and whether it was reasonable, that's going to have to be a factual issue. Can you respond to the idea that the receiver's involvement should have made them feel like they were okay? Yes. First of all, there's no evidence in any of the complaints that the receiver made key decisions. And if we take a look at the additional evidence that the defendants submitted, which we contend is inappropriate to consider. Which is the receiver's testimony? Yeah. The only thing you get from that is the receiver may have ordered that the prisoners from CIM be transferred to some other facility, not to San Quentin. He didn't decide that. The decision to send them to the highly risky San Quentin, which was 150 years old, that has no real ventilation system. They use industrial fans to move air around through bars without solid walls. It's overcrowded. They have no defendants. And the choice, of course, not to quarantine once they got there, not to test over the warnings of the nurses at CIM. Those were all decisions made by the prisoners. So counsel, the defendants argue that they faced the archetypal or archetypical Hobson's choice. Would you agree that if we agreed with you that they can't prevail on that at this stage, that they would still be that they really had no choice here, given everything that was going on? Absolutely. We welcome that argument later on, after there's a full factual record. And it's fair to have that argument. That argument would relate also to the matter of exactly what opinions were or were not made by medical experts at the different stages too, would it not? Right. In terms of whether the receiver did or did not have any specific role in it, as well as whether they did or did not ignore the expert testimony, essentially. That factual record would be developed. That will be developed. The one thing that's pled that we know about the receiver's involvement happens after the transfer, when he sends in his handpicked team of medical experts, who then survey the situation, and they write what they title as their urgent memo. And they advise a number of actions, including reducing the population immediately, especially of the aged inmates over 60 who have short sentences. That would include Mr. Hampton, for example. And other measures, which the defendants completely ignored. In fact, they were deliberately indifferent to those urgent recommendations of the receiver's experts. About the receiver's overall involvement, this court's case, Rico v. Ducart, points out, a court order does not give carte blanche to prison officials. And here we're not even talking about a court order directing the defendant's conduct. We're talking about possibly a receiver. And so even just a receiver standing in the background does not immunize their actions or create a reasonable belief that their actions were lawful. I'd like to just touch on one thing about the state law defenses. In our brief, we cited a Ninth Circuit case, A.E. v. County and Tulare, which basically said discretionary acts immunity should not be a basis for a motion to dismiss, because the record really can't be factually developed at that stage in the pleadings. I didn't know about this California Supreme Court case when we wrote the brief. I just found it in the defendant's case they submitted as a 28-J. But in addition, there's a California Supreme Court case that says the same thing, that in a demur, which is a California equivalent of a motion to dismiss, it's inappropriate to grant a demur based on discretionary acts immunity. That case is Lopez v. Southern California, Rapid Transit District, 40 Cal 3rd, 780, from 1985. So are these state immunities even appealable at this stage? Because we only have interlocutory appeals over immunity from suit, not immunity from liability. And the California Supreme Court decision in Quigley suggests these are immunities from liability. So I'm not sure we should even be talking about them. There is one immunity, Government Code 820.2, when this court has held that it's an immunity from suit. So we would agree the court has jurisdiction. But we held that before Quigley, which was a California Supreme Court case, clarifying how these immunities work. So I'm not sure that case is still good law. I'm wondering if we even can be talking about this or if we don't have jurisdiction over it at this stage. I'm honestly not sure about that. But I think that if the court does consider them, the record is not developed enough to even determine the facts that would be required for those immunities. And those facts certainly are not pled in the complaints. Any state official who can be found to have killed someone by deliberate indifference should have a steep hill to climb before they get qualified immunity. And this is not a close or an insignificant case. As the OIG found, this was a public health disaster at San Quentin. As a legislator called it, the worst prison health screw-up in state history. Based on the long series of Supreme Court cases, starting with Estelle, Hutto, Helling, Farmer, plus almost 45 years of Eighth Amendment jurisprudence, these defendants had fair notice that they violated inmates' rights by their deliberate indifference to the inmates' heightened risk of exposure to a serious communicable disease. Here, that foreseeably led to 28 inmate deaths and the death of one correctional sergeant. And Taylor v. Riojas, a very recent... I think I need to interrupt you because why don't you save, you're going to have, do you have another few minutes or is it someone else? I do, I think I have up to six more minutes. Okay, so we're here, why don't you save that time because we're over the clock now and we'll hear from you again in a bit. Should I sit down now? I think so because I think in this, unless we're going, it's a little bit confusing because we have all these different chunks, but I think your next minutes are like a little bit from now with some other people in between. Okay. So I think we now hear from Harris's counsel, Mr. Apps. Thank you, Your Honor. May it please the court, I'll very briefly address the issue of PrEP Act immunity, particularly in the light of the recent Kansas Supreme Court case, MTV Walmart stores, which was brought to the court's attention by defendants actually, but I find that it's quite helpful for plaintiff's side, so I thought I would discuss that. Over the last three years, district courts across the country have been challenged by this question of the proper scope of immunity under the PrEP Act. Almost all of them have reached the same conclusion that there is a misuse versus a non-use test. The PrEP Act immunizes covered entities from misuse of a covered countermeasure, but does not apply to claims that arise from non-use. In MT versus Walmart stores, the Kansas Supreme Court adopted that approach of the numerous federal district courts and provided some further guidance, which I think can be persuasive for this court for distinguishing between misuse and non-use claims. According to the Kansas Supreme Court, the distinction is a matter of application of but-for causality, so that a claim is covered by the PrEP Act if there would be no claim at all but-for administration of a covered countermeasure. So in the MT versus Walmart stores case that they considered, the claim would not have existed at all if a COVID-19 vaccine had not been administered, so they found it constituted a misuse claim. What I want to emphasize is that in the cases under consideration today, the test of but-for causality leads to the opposite result. In these cases, if no covered countermeasure had been administered at all, then the claims would still exist. Could I shift gears for a second? I think we understand your argument on that. Thank you. I had a procedural question because you're counsel for Harris, and the Harris complaint has fewer allegations than some of the other complaints that we're talking about here today, including, as I read it, the Harris complaint doesn't even say that there was a COVID outbreak at CIM, and so I think the Harris complaint could only state a claim if it included the OIG report, which I think you've said we can consider, but I'm wondering if you have any authority for the idea that we can consider materials attached to a complaint or outside the complaint for their existence, because I think you want us to read the OIG report to learn that there was a CIM outbreak of COVID. Yes, Your Honor. Well, in this case, I haven't had an opportunity to pursue amendment of the Harris case because of the, you know, all the cases being bundled and brought here at once. I likely would amend the complaint if given the opportunity to include allegations contained in numerous of the other complaints in the OIG report. Here, I believe the OIG report, because it's been brought to the attention of the court by all of the various parties, I believe it's fair to consider it in this context, but if, you know, if for some reason it was required to somehow sever Harris from the other complaints because of the differences between the complaints, then I would be pursuing amendment in Harris. And would, it sounds like maybe you haven't researched this particular procedural point, but do you know of any authority that says when both sides basically agree that something outside the complaint can be considered, that we just consider it like a constructive amendment of the complaint? Is there authority for that, that consent leads to incorporation? I don't have an authority for that at this moment, Your Honor. I suspect there is such an authority, but I don't have it on me, as it were. I take it, counsel, that your argument, though, is even if we were to find there weren't such authority, that if we agree that if the allegations in the IG report were considered as part of the complaint, that we should send it back to give you the opportunity to amend? Yes, Your Honor. Oh, and I also wanted to point out, I also represent Mr. Cooper, and in response to one of Mr. Fisher's comments, there is an allegation there that Mr. Cooper was, you know, placed together with a celly who had COVID-19 until he acquired it. So I believe in his discussion of helling, Mr. Fisher said there was not such an allegation in the complaints, but in fact Mr. Cooper makes that allegation in this complaint. Thank you. We have you down to seven seconds. I don't know if you could wrap up. I think that the court should adopt the persuasive reasoning of the Kansas Supreme Court and numerous district courts and find that none of the claims here are barred by the PREP Act because they all arise from non-use of covered countermeasures at the necessary and timely testing because it happened so much earlier, I think. It's a bit of a red herring here. Thank you. Thank you, counsel. Okay, I think we now, well now I have Mr. Haddad next, but I wonder if we should go to Mr. Francisco so that we lump everyone together and then come back to Haddad, if that's okay? Would that work? So why don't we do the two minutes for Mr. Francisco Kajina? Sorry if I said your name wrong. It's okay, Your Honor. Thank you. Gosh, sorry. It's okay. May it please the court, Fulvio Kajina for the leg plaintiffs. I was just going to address a very small, well not small issue, I guess. The leg complaint does not mention or make any reference to the OIG report. I know that appellants spend considerable time trying to use the OIG report as a basis for their qualified immunity argument as it relates to whether they acted reasonably. But again, from the leg plaintiff's perspectives, we are governed by the four corners of the complaint. We made no reference to any of the extraneous materials that defendants are trying to bring through judicial notice here, and especially not as to any of the... Can I interrupt you? I have a few questions about this. So I guess, first of all, in the district court, I think you agreed that other counsel could argue on your behalf, other counsel who were saying that the OIG report should be considered on Mr. Legg's behalf. And so I'm wondering if this issue is waived, and now the OIG report essentially is part of the Legg case as well. Defendants cite no authority for that proposition, not to mention the fact that our pleadings have always objected to the OIG report, both at the trial court level and here at the appellate level. And the only reason why I'm appearing here and not ceding time to Mr. Haddad for his argument is to specifically carve out that the Legg never ever relied on the OIG report, and that's outside of the four corners of our... So now my next question is, why are you objecting to this? Because I would have thought the OIG report helped you, and some of the allegations that other plaintiffs are using it for aren't in the Legg complaint, as I read it. So like that the number of inmates on the buses exceeded the prior guidance, that's not in your complaint, but it is in the OIG report. Doesn't that help you? A lot of things in the OIG report, I agree with your honor, help us. That being said, we are kind of sticklers here, and we want to make sure that our complaint is just... Any order based on our complaint is just limited to the four corners of what we actually pledged, because what we pledged sustained our causes of action in this case. And if we thought they didn't state a cause of action at this point, you would want to amend to add parts of the OIG report? Or what is the goal here about why you're... Can you explain why you're being a stickler? The reason I'm being a stickler is because defendants spend considerable time trying to bolster their qualified immunity argument using the OIG report, but that's something extraneous, and that should be not considered in our case. That's why we're being sticklers. But if we were to say, without the allegation about crowding on the buses, you're... Just hypothetically, if we thought that you were missing some allegations that were needed to state this deliberate indifference claim, then you would want to amend to add some of the facts that other plaintiffs are relying on the OIG report for? Yes, we meant to include additional facts. It doesn't have to necessarily come through the OIG report, though. Right. You would just have to... Any other questions for the Legg case? Okay, we've taken you over your time. I guess I'm taking you over your time. Thank you, counsel. Thank you, yeah. So we do have a little bit more time then for Mr. Haddad, who's the... Yes, we've done everyone else. I would like to provide the court with a couple more examples of clearly established law before I sit down. Okay, in Farmer v. Brennan, there's another clear example that the Supreme Court gave there, that the defendants did not even address in their reply brief at all. So here's what... Another thing that Farmer said. The court gave another obvious example, and obvious is the court's word in the opinion, of a prison official, quote, would not escape liability when the official, quote, knows that some diseases are communicable, and that a single needle is being used to administer flu shots to prisoners, but refuses to listen to a subordinate who he strongly suspects will attempt to explain the associated risk of transmitting disease, unquote. And so that's a warning the Supreme Court put out specifically, and it's so similar to the facts in this case, where a subordinate to all the defendants here warned them that a particular thing, that is, in this situation, not testing the inmates right before putting them on the bus would be a public health disaster. In fact, one of the nurses wrote, what about patient safety? And the response was a deliberate decision to say no to that. And so that's exactly what Farmer warned against. The other case I want to bring to the court's attention is Taylor versus Riojas, which is a recent qualified immunity case from the Supreme Court in 2020. And it's one of those rare cases where this Supreme Court has actually denied qualified immunity. And it did it there in a prison case where an inmate was subjected to six days in a cell that had excrement in it and a backed up toilet. And the court described those conditions as, quote, shockingly unsanitary cells. Six days. What we have here is six weeks, or even six months for some inmates, leading to their deaths. And what could be more shockingly unsanitary than cells and facilities that are contaminated with a deadly contagious disease that the defendants brought there? And so I think if Taylor versus Riojas is a situation where our Supreme Court could hold that was an obvious call, you can't do that to a prisoner, then this is even stronger. Thank you. Thank you, counsel. So I think we have at least five minutes left for the state. I'd like to begin just by quickly addressing Taylor v. Riojas and the stark contrast between stark contrast between having, for punitive purposes, putting an inmate in a cell that is, they described it covered floor to ceiling in human feces and being housed in a prison where inmates had been transported over who, at the time that they were transported, had negative COVID tests and had most recently screened not having any COVID-like symptoms. They're just not an circumstances at issue in this case, including the ongoing supervision by the Plata court, the Plata receiver's presence and supervision, the Plata plaintiff's pressure to conduct this very transfer in all of those circumstances. It also would be at odds with the Supreme Court's most recent articulation of this, the qualified immunity standard in Riojas v. Riojas, in which again, that was an excessive force case, but again, we're creating a dichotomy between cases in which there is an obvious violation and in all other cases, a need for there to be a case under similar circumstances where a violation was found so that public officials could be guided in what kind of conduct would and would not violate the eighth amendment. And the generalized statement that something needs to be done to protect inmates from communicable diseases doesn't cover the situation here in which we're dealing with a global pandemic and a disease that managed to work its way into, as far as we know, every prison. Could you perhaps follow on that regard? Could you follow up on Judge Friedland's earlier question with respect to the OIG report as to the, to the extent to which Harris, Cooper, Quayle, and Thorpe can have not alleged certain facts in the incorporation of the OIG report? Because in the OIG report, there's actually I think, along with the others that Judge Friedland listed too, concerns of nurses saying, slow down, get it right. That's in the OIG report and responding to one email by ordering no re-swabbing. There's some pretty damning items in that OIG report. We may or may not await amended complaints. So how, I'd like your response to that in terms of We don't dispute consideration of the facts in the OIG report, particularly in Cooper, Quayle, and Harris, who have actually affixed it. Yeah, I think it's Harris, Cooper, Quayle, and Thorpe are those who've alleged certain things. Yes, the ones that are attached, even where incorporated by reference. We would cite the court to the Sprewell, I apologize. I'm going to give you the citation. Sorry, what is the citation? In our briefing, it's Sprewell versus Golden State Warriors, 266 F3rd. It might be an important day to notice the Warriors, by the way. Yeah, it's a pretty crucial day for them. We'll make a record of that. I appreciate that, Your Honor. But the point being, though, that Sorry, so what does that case stand for? The cite you just gave us? That courts can consider the attachments to a complaint as factual allegations contained therein and take them for their truth, in addition to things incorporated by reference. For the incorporation by reference doctrine, I'd also refer the court to JKJ versus City of San Diego, I think. We also cite that in our brief in our discussion of why the court should consider With the incorporated by reference ones, I had trouble finding a case where they were used for the truth of what's in it, rather than just its existence. I would refer the court to the JKJ decision that points out that it can't be used to contradict well-pleaded facts in the complaint, but can be used to fill in factual gaps. But we would point to those emails by the nurses and staff as contrary public health opinions, and the decision was made to go through with the transfer, but that decision can't be viewed in a vacuum. It can't be viewed as risk in doing and no risk in not doing. There was also a considerable countervailing risk in not conducting the transfer, and that was also clear from that same document. The outbreak at CIM made that well established that they were confronted with pressure from plaintiffs in the Plata litigation, which it just so happened those plaintiffs would represent all of the plaintiffs here in that capacity, the class in Plata is broad enough, pressuring them to move those inmates out of CIM for that very reason. And so that was the risk. The risk was either leave them where they are or do a different type of thing. I want to point out specifically, though, in response to opposing counsel's argument, the idea that a four-day differential between when you test and an act of omission of some sort would be insufficient. This court can probably recall that at that time, and I believe it's in at least some of the complaints, it would take that long to get a test result for COVID-19 back in early 2020. And so the idea that testing would have to be continuous or arguably you could never conduct a test because if you test it and then move the next day, you don't have the results yet. If you wait four days, the test isn't good anymore, would make it impossible to actually have a test that would be useful. Why doesn't that just wash out the language of the statute? I would refer the court again to that MT decision that we submitted in our briefs that discusses some of this as well. But it doesn't require that the covered countermeasure be particularly functional. It doesn't require that it be used correctly. And it frankly doesn't require that it be used explicitly. I would refer the court for that to the addendum to the Hampton brief at 59 to 61. According to the general counsel's opinion, interpreting the PREP Act and interpreting the HHS secretary's declaration, he was quite clear that certain types of non-use decisions would still be covered because they're part of the general administration. Wasn't that always though when it's like you've got two people and you've got to decide which one to give it to because it's a limited resource? I don't think that's really the allegation here. No, your honor. It's not limited to that is my answer. And if the court were to refer to that portion of the opinion, the general counsel makes it clear that they are referring to, it refers to decisions to, sorry, it refers to claims based on, claims of loss based on failure to timely provide PPE, failure to train staff sufficiently and how to use PPE, and other types of calculated decisions that relate to non-use. In this case, again, though, I'd reiterate that we don't have a non-use situation. We have a dispute over whether they were used appropriately, tests being administered at early and mid-May, and then again post-transfer rather than immediately before transfer. And I see that I'm out of time. Thank you, your honors. Thank you all counsel for the helpful arguments in this case. This case is submitted.
judges: FRIEDLAND, BENNETT, Bennett